**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MOTHERBOARD EXPRESS COMPANY, d/b/a MBX SYSTEMS | Case No. _____ |
| Plaintiff, | |
| v. | Hon. _____ |
| THOMAS LARSON, | |
| Defendant. | |

## COMPLAINT

Plaintiff Motherboard Systems Company d/b/a MBX Systems ("MBX"), for its Complaint against Defendant Thomas Larson ("Larson"), respectfully states and alleges as follows:

## NATURE OF THE ACTION

1.     MBX brings this action against Larson, MBX's former Director of Safety and Security, for breach of his restrictive covenants and confidentiality obligations under his Employment Agreement, for tortious interference with MBX's customer relationships, misappropriation of MBX's trade secrets in violation of both the Illinois Trade Secrets Act ("ITSA") and the Defend Trade Secrets Act ("DTSA"), violations of the Computer Fraud and Abuse Act ("CFAA"), and violation of his fiduciary duties to MBX.

2.     Shortly before resigning from MBX in October 2021 to work for its competitor, Larson conducted a mass download of MBX's files, which contained MBX's trade secrets and confidential information, including: specific and discrete business opportunities being pursued by MBX; customer lists; information regarding customers and potential customers, including pricing models and bid information, technical specifications and products sold to customers, account information and forecasts, company financial and operational results; and company strategic plans.

MBX recently learned of this misconduct after a customer informed it that Larson had successfully solicited its business; that prompted MBX to commission a forensic review through a third party.

3.      Larson has opportunistically and unlawfully capitalized on that purloined information, engaging in a campaign to undermine MBX's relationships with its customers and steal them away by utilizing the confidential and trade secret information he learned as an MBX executive and egressed on his way out the door.  His unseemly conduct clearly violated the restrictive covenants he signed as part of his employment with MBX.

4.      As a result of Larson's misconduct, MBX needs permanent injunctive relief: (1) ordering Larson to provide to MBX for forensic analysis, any and all personal computers, thumb drives, external hard drives, back-up drives and other electronic data storage devices in Larson's possession, custody or control that contain MBX's confidential information; (2)  prohibiting Larson from using or disclosing MBX's confidential information in violation of his confidentiality obligations contained in his Employment Agreement with MBX; and (3) requiring Larson to provide an accounting of MBX's confidential information in his possession, custody or control, whether in hard copy, electronic or any other form.

5.      MBX is also entitled to monetary damages resulting from Larson's unlawful conduct that has already caused it to suffer substantial damage.

## PARTIES, JURISDICTION AND VENUE

6.      MBX is a Delaware limited liability company with its principal place of business located at 1200 Technology Way, Libertyville, Illinois 60048.

7.      During his employment with MBX, Larson was a citizen of Illinois and, upon information and belief, currently resides in Wheaton, Illinois.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because MBX has raised a federal question alleging that Larson has violated federal law.

Specifically, MBX has alleged claims for trade secret misappropriation under the DTSA, 18 U.S.C. § 1367, *et seq.* and for violation of the CFAA, 18 U.S.C. § 1030, *et seq.* This Court has supplemental jurisdiction over the MBX's other claims pursuant to 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over Larson because he resides and has conducted business within the State of Illinois.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTS

### I. MBX's Business

11. MBX is an Illinois-based computer hardware company that specializes in designing and manufacturing OEM hardware solutions for application developers deploying their software on single-purpose systems. MBX combines turnkey hardware programs with value-added services, including platform configuration, hardware branding, inventory management, global logistics, product support, and system warranties. Founded in 1995, MBX's reputation is built on a strategic approach to customers' hardware programs.

### II. MBX's Confidential and Trade Secret Information

12. MBX has developed and maintains a large volume of trade secrets and other confidential and proprietary business information including, without limitation, information regarding identifiable, specific and discrete business opportunities being pursued by the company, customer lists, information regarding customers and potential customers including pricing models and bid information, technical specifications and products sold to customers, account information and forecasts, company financial and operational results, and company strategic plans.

### III. MBX Protects its Trade Secrets and other Confidential Information

13. MBX treats its trade secrets and other confidential information as confidential and makes reasonable efforts to maintain the secrecy and confidentiality of that information through, among other things: (a) requiring employees to enter into confidentiality agreements; (b) password protecting computers; (c) installing and maintaining specific software packages on its computers, including laptops used remotely by employees, so that the firm can track unauthorized copying, transfer or loss of sensitive company data; (d) requiring employees to return all information upon separation from MBX; and (e) limiting access to its trade secrets and other confidential information to only those employees and members who have a legitimate need for such information to perform their jobs on behalf of MBX.

14. MBX's trade secrets and other confidential information derive economic and competitive value from not being generally known to MBX's competitors and not being readily ascertainable by proper means by others who would gain economic value from its disclosure or use.

15. If MBX's trade secrets and other confidential information are used by a competitor, MBX's competitive position would be severely undermined, and its competitors would be able to trade on many years of MBX's valuable accumulated knowledge.

### IV. Larson's Employment With MBX

16. On or about March 2, 2020, Larson became Director of Safety and Security for MBX.

17. In that position, Larson was responsible for developing a product portfolio specifically for the Safety and Security market. This included negotiating costs and setting prices, as well as making recommendations on inventory positions for these products. He was responsible

for selling the value proposition of MBX to the Safety and Security market and maintaining strategic relationships with our customers in this market.

18.     Larson was also responsible for setting the annual strategy for the Safety and Security team and held overall responsibility for the team meeting financial and operational goals. He was tasked with building relationships with vendors and partners.  Larson was also responsible for any training, hiring or firing decision on the team. He managed the overall budget for the team and made decisions on where to invest in the team financially.

19.     In addition to his responsibilities relating to the Safety and Security market, Larson was also a member of the MBX leadership team and was involved in developing and executing the company's overall strategic plans.

## V.     Larson's Access to MBX's Trade Secrets and other Confidential Information

20.     To facilitate Larson's job responsibilities, MBX provided him with access to its trade secrets and other confidential business information, including but not limited to: its customer lists, information identifying specific and discrete business opportunities being pursued by MBX; information regarding customers and potential customers including pricing models and bid information; technical specifications and products sold to customers, account information and forecasts, company financial and operational results, and company strategic plans.

21.     The development, maintenance, and confidentiality of this information are essential to MBX's business.

22.     MBX maintained much of this information in certain electronic files located on MBX's secure computer servers.

23.     Larson utilized this information throughout his employment at MBX and, without any legitimate justification, downloaded many of the files immediately prior to his departure from MBX.

**VI.     Larson's Non-Solicitation, Confidentiality, and Work Made for Hire Obligations in the Employee Confidentiality and Inventions Assignment Agreement**

24.     In consideration of Larson's employment with MBX and in order to access to MBX's confidential information, Larson executed an Employee Confidentiality and Inventions Assignment Agreement ("Confidentiality Agreement"). (A copy of Larson's Confidentiality Agreement is attached as Exhibit A.)

25.     Section 9.2 of the Confidentiality Agreement states that it is governed by and must be construed in accordance with the laws of the State of Illinois.  (Ex. A.)

26.     Section 1 of the Confidentiality Agreement contains a confidentiality provision that states:

> 1.1     **Proprietary Information.** The term "Proprietary Information" means any and all confidential and/or proprietary knowledge, data or information of the Company, whether embodied in tangible or intangible forms. By way of illustration but not limitation, "Proprietary Information" includes any information related to Inventions (as defined in Section 2 below), data, concepts, compilations, techniques, processes, methods, models, systems, designs, computer programs, object code, source code, source documentation, patent disclosures, procedures, trade secrets, formulas, development or experimental work, results of experimentation or t sting, specifications, strategies, plans for research or development, new products, marketing and selling, forecasts, business plans, budgets and unpublished financial statements, licenses, prices, costs, suppliers and customers, and any other nonpublic information that has commercial value.

> 1.2     **Restrictions on Disclosure and Use; Recognition of Company's Rights.** At all times during my employment and thereafter, I shall hold Proprietary Information in strictest confidence and not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) any Proprietary Information unless authorized by an officer of the Company in writing. I shall not use any Proprietary Information except in connection with my work for the Company. I acknowledge that before publishing or otherwise disseminating outside of the Company (through public speaking

- 6 -

engagements or otherwise) any material that incorporates any Proprietary Information, or otherwise relates to my work at the Company, I must 1rst obtain written approval from an officer of the Company. All Proprietary Information provided to or prepared by me is the sole property of the Company or its assigns.

1.3     **Third Party Information.** I acknowledge that the Company has received and in the future will receive confidential and/or proprietary information from third parties ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of the Third Party Information and to use it only for certain limit purposes. At all times during my employment and thereafter, I shall hold Third Party Information in strictest confidence and not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) any Third Party Information unless authorized by an officer of the Company in writing. I shall not use any Third Party Information except in connection with my work for the Company.

(Ex. A.)

27.     Section 2 of the Employment Agreement contains an assignment of inventions

provision that states:

2.1     **Intellectual Property Rights; Inventions.** The term "Intellectual Property Rights" means all trade secrets, patents, copyrights, trademarks, service marks, mask works and other intellectual property rights throughout the world, including without limitation all applications, extensions, renewals and continuations of any of the foregoing. The term "Inventions" means all discoveries, designs, developments, processes, methodologies, machines, compositions of matter, ideas, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), including any improvements to any of the foregoing.

2.2     **Assignment of Company Inventions.** I shall promptly make full written disclosure to the Company, shall hold in trust for the sole right and benefit of the Company, and hereby assign to the Company or its designee, all my right, title and interest throughout the world in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned to the Company or its designee are hereinafter referred to as "Company Inventions." I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I acknowledge that all Company Inventions made by me (solely or jointly with others) within the scope of and during the period of my employment are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. To the extent any right, title or

- 7 -

interest in and to Company Inventions cannot be assigned or licensed by me to the Company, I hereby irrevocably waive and agree never to assert such non-assignable and non-licensable rights, title and interest against the Company or any of the Company's successors in interest.

(*Id.*)

28.     Section 3 of the Employment Agreement contains a restrictive covenant provision

that states:

> 3.     **No Conflicts or Solicitation.** I acknowledge that during my employment, I will have access to and knowledge of Proprietary Information and that such Proprietary Information includes valuable trade secrets of the Company. During the period of my employment with the Company, I shall not, unless authorized by an officer of the Company in writing, engage in any other employment or business activity directly related to the business in which the Company is now involved or becomes involved or in any other activities that conflict with my obligations to the Company. I represent that I am not currently and that I shall not become a party to any other agreement that is in conflict or will prevent me from complying with this Agreement. During the period of my employment with the Company and continuing until one year after my last day of employment with the Company, I shall not (a) directly or indirectly induce any employee of the Company to terminate or negatively alter his or her relationship with the Company, (b) solicit the business of any client or customer of the Com any (other than on behalf of the Company), (c) induce any supplier, vendor, consultant or independent contractor of the Company to terminate or negatively alter his, her or its relationship with the Company, or (d) (whether as an employee, employer, owner, operator, manager, advisor, consultant, contractor, agent, partner, director, stockholder, officer or any other similar capacity to an entity) engage in the same or similar business as the Company. Activities prohibited by the foregoing sentence shall include any activity that may require or inevitably require disclosure of trade secrets or Proprietary Information of Company.

(*Id.*)

29.     The Confidentiality Agreement is legal, valid, and binding.  These covenants were supported by good and valuable consideration to which Larson otherwise would not have been entitled absent his execution of the agreement.

30.     MBX has fulfilled all of its obligations under the Agreement.

VII.  **Larson Misappropriates MBX's Trade Secrets and Other Confidential Information and Then Resigns**

31.  MBX just recently learned through a third-party forensic examination that in September 2021, Larson began downloading a substantial volume of files from MBX's systems.

32.  Specifically, in the months prior to September 2021, Larson had downloaded approximately 10 files per month from MBX's systems; however, beginning on September 17, 2021, Larson downloaded over 930 files from MBX's system in a 10-day time frame.

33.  The files Larson downloaded contained a trove of MBX's trade secret and confidential information, including: specific and discrete business opportunities being pursued by MBX; customer lists; information regarding customers and potential customers, including pricing models and bid information, technical specifications and products sold to customers, account information and forecasts, company financial and operational results; and company strategic plans.

34.  More specifically, these files contained, among other things: account summaries; build forecasts; budget planning documents; talent acquisition plans; KPI trackers; overviews of MBX's portfolio; profiles of existing MBX customers; performance metrics; account strategies; MBX product lists; pricing information; and pricing profile information.

35.  Upon information and belief, a significant portion of these files were not needed for Larson to carry out the responsibilities of his position with MBX at the time he downloaded them.

36.  Additionally, upon information and belief, around this same time frame, Larson began using his personal laptop for MBX business instead of his MBX-issued laptop, in violation of company policy.

37.  Larson's mass download of information during this time frame was unauthorized and unknown to MBX.

38.     Shining a light on the alarming nature of Larson's mass download at the above-referenced times, Larson then resigned his employment from MBX on October 5, 2021. At the time of his resignation, Larson informed MBX that he was joining a company that did not directly compete with MBX; however, shortly after his resignation, MBX began receiving information that Larson had been approaching MBX customers to solicit their business. Shortly thereafter, Larson also began a consulting relationship with Velasea, LLC ("Velasea"), one of MBX's direct competitors.

39.     Upon information and belief, Larson has utilized this information to benefit both himself and Velasea at MBX's expense.

40.     There is absolutely no legitimate reason for Larson to continue to have access to this information given his resignation from MBX.

**VIII.    Larson Breaches His Confidentiality Agreement With MBX**

41.     Velasea is an OEM system builder that sells products and services that compete with MBX's products and services.

42.     Velasea is a "same or similar business" to MBX, as provided in the Confidentiality Agreement.

43.     In November 2021, MBX learned that Larson was attempting to solicit MBX's customers for the benefit of himself and Velasea in violation of the Confidentiality Agreement.

44.     On November 16, 2021, MBX sent cease and desist letters to both Larson and Velasea, reminding them of Larson's obligations under the Confidentiality Agreement.

45.     Following the cease and desist letters, MBX's counsel exchanged correspondence with counsel for Larson and Velasea.   In the correspondence, Larson and Velasea made representations that:  Larson shall comply with any required obligations of the MBX Agreement;

neither party shall use or disclose "Proprietary Information" as defined in the MBX Agreement in connection with any services provided under Larson's agreement with Velasea; and Larson and Velasea shall voluntarily abide by the provisions of the MBX Agreement applicable to the solicitation of employees, clients, customers, suppliers, vendors, consultants, and independent contractors of MBX.

46.     MBX accepted and relied on Larson and Velasea's representations.

47.     However, in November 2022, MBX was informed by one of its customers that beginning in September 2021, and prior to the expiration of the restrictive covenant obligations in the Confidentiality Agreement, Larson and Velasea began soliciting their business and, as a result of those solicitations, MBX's customer was moving its business from MBX to Velasea.

48.     To date, a relatively substantial volume of business has been moved from MBX to Velasea as a result of Larson's conduct.

49.     Upon information and belief, Larson represented to this customer that he was going to take all of MBX's business.

**CAUSES OF ACTION**

**COUNT I – BREACH OF CONTRACT**

50.     MBX incorporates the allegations in Paragraphs 1 through 49 as though set forth fully herein.

51.     The Confidentiality Agreement between Larson and MBX is a valid and enforceable contract.

52.     The confidentiality and restrictive covenant provisions contained in the Confidentiality Agreement are reasonable in scope and duration and are reasonably necessary to

protect MBX's legitimate and protectable interests in its client relationships and goodwill, as well as its trade secrets and other confidential and proprietary information.

53.     MBX performed its obligations under the Confidentiality Agreement.

54.     Larson has breached his Confidentiality Agreement obligations by misappropriating MBX's trade secrets, copyrighted materials, and other confidential business information and data.

55.     Larson has breached his post-employment contractual obligations owing to MBX by: providing services to Velasea; soliciting, attempting to solicit, or in any other way, attempting to influence MBX's customers to alter or terminate their business relationship with MBX; and misusing MBX's confidential and proprietary information.

56.     As a result of Larson's breach of his Confidentiality Agreement, MBX has suffered and will continue to suffer irreparable and other injury.  MBX is threatened with losing the value of its confidential information, its competitive advantage, income and goodwill in amounts which may be impossible to determine.

### COUNT II – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE: MBX'S CUSTOMERS

57.     MBX hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 56.

58.     Until the events giving rise to this action, MBX had maintained valid and lucrative business relationships with its customers and/or prospective customers.

59.     MBX's relationships generated goodwill among these customers and created an expectation of future business.  The knowledge MBX has gained about these customers and the business terms of these relationships are confidential and proprietary business information.

60.    As a former MBX executive, Larson remains aware of MBX's customer relationships, the unique knowledge MBX possesses about these customers and the business terms of MBX's relationships with these customers.

61.    Larson has maliciously and tortiously misappropriated the information he acquired as an MBX executive to divert business from MBX to Velasea, intentionally and unjustifiably interfering with MBX's business relationships.

62.    As a result of Larson's tortious interference with MBX's business relationships with its customers and/or prospective customers, MBX has been injured and faces irreparable injury.  MBX has lost and is threatened with continuing to lose customers, its competitive advantage and goodwill.

## COUNT III– VIOLATION OF THE ILLINOIS TRADE SECRETS ACT
### 765 ILCS § 1065, *et seq.*

63.    MBX incorporates the allegations in Paragraphs 1 through 62 as though set forth fully herein.

64.    Larson has acquired MBX's trade secrets by improper means.

65.    Larson has disclosed and/or used MBX's trade secrets without MBX's consent.

66.    As a direct and proximate result of Larson's conduct in violation of the ITSA, MBX has suffered damages in an amount to be determined at trial and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its information, its goodwill and other legitimate business interests.

## COUNT IV–VIOLATION OF THE DEFEND TRADE SECRETS ACT
### 18 U.S.C. § 1836, *et seq.*

67.    MBX incorporates the allegations in Paragraphs 1 through 66 as though set forth fully herein.

- 13 -

68.     MBX's clients are located throughout the United States and the world.

69.     MBX's information that Larson misappropriated and downloaded prior to his resignation is intended MBX's use in providing products and services to its customers throughout the United States and the world.

70.     The information that Larson misappropriated is the property of MBX and qualifies as a trade secret under the DTSA, 18 U.S.C. § 1836, *et seq.*

71.     While Larson was employed by MBX, he knew or should have known that the information was protected and that he had a duty to maintain the secrecy of that information.

72.     Upon information and belief, Larson has willfully and improperly used and is using MBX's trade secrets and has disclosed and used and intends to continue to disclose and use MBX's trade secrets for his own financial benefit.

73.     Larson has no justification for this disclosure and use, and knows or should know that the trade secrets belong to MBX.

74.     Larson's use and disclosure of MBX's trade secrets will irreparably harm MBX and destroy the confidential nature of the information.

75.     MBX has suffered damages as a result of Larson's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its information, its goodwill and other legitimate business interests.

**COUNT V– VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. §1030, *et seq.***

76.     MBX incorporates the allegations in Paragraphs 1 through 75 as though set forth fully herein.

77.     MBX's computer system is a protected network which is used across state lines in interstate commerce, has Internet access across state lines, and is used to transfer MBX's information for sale in interstate commerce.

78.     Larson was not authorized by MBX to access its computer system for personal gain, access its computerized information, copy electronic information files, destroy electronic information files, send electronic files to USB memory devices or other external electronic storage devices or continue to possess MBX's electronic files and data for personal gain or that of a competitor.

79.     As a result of Larson's actions, MBX has suffered damage based on the impairment to the integrity of its computer systems, as well as cost associated with determining the extent of Larson's misconduct.

80.     MBX has already expended over $5,000 to respond to Larson's offenses, including the cost of an independent forensic investigation.

81.     Based on the foregoing, Larson:

(a) intentionally accessed a computer system without authorization or exceeded his authority to obtain information from a protected computer causing damage in excess of $5,000 during a one year period in violation of 18 U.S.C. §1030(a)(2)(C);

(b) knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded his authorized access, and by means of such conduct furthered the intended fraud and obtained valuable information resulting in damages exceeding $5,000 during a one year period in violation of 18 U.S.C. §1030(a)(4);

(c) knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without

- 15 -

authorization, to a protected computer in excess of $5,000 during a one-year period in violation of 18 U.S.C. §1030(a)(5)(A);

(d) intentionally accessed a protected computer without authorization or exceeded his authorized access, and, as a result of such conduct, recklessly cause damage in excess of $5,000 during a one-year period in violation of 18 U.S.C. §1030(a)(5)(B); and/or

(e) intentionally accessed a protected computer without authorization or exceeded his authorized access, and, as a result of such conduct, caused damage and loss in excess of $5,000 during a one-year period in violation of 18 U.S.C. §1030(a)(5)(C).

82.     MBX has suffered damages as a result of Larson's actions in an amount to be determined at trial and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its information, its goodwill and other legitimate business interests.

## COUNT VI - BREACH OF FIDUCIARY DUTY

83.     MBX incorporates the allegations in Paragraphs 1 through 82 as though set forth fully herein.

84.     As a MBX executive, Larson owed MBX an undivided duty of loyalty and was obligated to act with the utmost good faith and candor and in the best interests of MBX.

85.     MBX relied on Larson's duties of loyalty, integrity, and faithful performance of his duties and responsibilities.

86.     Larson knowingly and willingly breached those fiduciary duties by misappropriating MBX's trade secrets for his own personal gain through improper means.

87.     As a direct and proximate result of Larson's disloyalty and breach of his fiduciary duties, MBX has been and is being harmed.  Larson is still in possession of MBX's valuable

- 16 -

confidential business information and trade secrets and is able to access and use this information for his own personal gain and for the benefit of MBX's competitors.

88.     On information and belief, Larson has shared this confidential information with at least one of MBX's competitors, using the information to MBX's detriment.

89.     Larson's actions have caused and will continue to cause damage to MBX and, unless restrained, will further damage MBX, the nature and extent of which may not be able to be proven with certainty, irreparably injuring MBX, leaving it without an adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Motherboard Systems Company d/b/a MBX Systems seeks judgment in its favor and an Order granting the following relief:

A.     A permanent injunction compelling Larson, his agents, and all those persons in active concert or participation with Larson to:

1.     Comply with his contractual obligations owed to MBX;

2.     Cease all tortious interference with MBX's customer relationships;

3.     Refrain from any use or disclosure of MBX's trade secrets and other confidential information;

4.     Immediately return to MBX, all trade secrets and other confidential information belonging to MBX in both hard copy and electronic form;

5.     Turn over for forensic analysis, any and all personal computers, thumb drives, external hard drives, back-up drives and other electronic data storage devices in Larson's possession, custody or control that contain MBX's confidential information;

6.      Provide an accounting of MBX's confidential information in his possession, custody or control, whether in hard copy, electronic or any other form; and

7.      Refrain from any destruction of MBX's property of spoliation of material evidence.

**B.**      That MBX be awarded compensatory damages to be proven at trial;

**C.**      That MBX be awarded exemplary or punitive damages in an amount to be proven at trial due to Defendant's tortious acts;

**D.**      That MBX be awarded statutory damages as provided under applicable statute;

**E.**      That MBX be awarded its reasonable attorneys' fees and court costs incurred in prosecuting this action; and

**F.**      That MBX be awarded such other and further relief as the Court deems just and equitable.

## JURY TRIAL DEMANDED

90.      Plaintiff MBX demands trial by jury in open court.

Date: January 25, 2023

Respectfully Submitted,

By: */s/ Steven J. Pearlman*
Steven J. Pearlman
Alexandra S. Oxyer
PROSKAUER ROSE LLP
70 W. Madison, Suite 3800
Chicago, Illinois 60602
Phone: (312) 962-3545
Fax: (312) 962-3551
Email: spearlman@proskauer.com
      aoxyer@proskauer.com

*Attorneys for Plaintiff MBX Systems*