**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MOTHERBOARD EXPRESS COMPANY, )<br>d/b/a MBX SYSTEMS )<br>)<br>    Plaintiff, )<br>)<br>v.          )<br>)<br>THOMAS LARSON )<br>)<br>    Defendant. ) | Case No. 1:23-cv-00475<br><br>Honorable Franklin U. Valderrama<br><br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT THOMAS LARSON'S**
**ANSWER TO PLAINTIFF'S COMPLAINT**

Defendant Thomas Larson (hereinafter "Larson" or "Defendant"), by and through his undersigned counsel, hereby responds to Plaintiff Motherboard Express Company d/b/a MBX Systems ("MBX" or "Plaintiff")'s Complaint (Dkt. 1) as follows:

**NATURE OF THE ACTION**

1.  MBX brings this action against Larson, MBX's former Director of Safety and Security, for breach of his restrictive covenants and confidentiality obligations under his Employment Agreement, for tortious interference with MBX's customer relationships, misappropriation of MBX's trade secrets in violation of both the Illinois Trade Secrets Act ("ITSA") and the Defend Trade Secrets Act ("DTSA"), violations of the Computer Fraud and Abuse Act ("CFAA"), and violation of his fiduciary duties to MBX.

**ANSWER:** Larson admits that he was an employee of MBX for a brief period of time and assigned the title of Director of Safety and Security and that the Complaint purports to assert claims of breach of contract, tortious interference with customer relationships and misappropriation of trade secrets, but Larson denies he was a director of MBX and lacks sufficient

knowledge to admit or deny the allegations concerning MBX's reasons for bringing this action.

Larson denies the remaining allegations in this paragraph.


2.      Shortly before resigning from MBX in October 2021 to work for its competitor, Larson conducted a mass download of MBX's files, which contained MBX's trade secrets and confidential information, including: specific and discrete business opportunities being pursued by MBX; customer lists; information regarding customers and potential customers, including pricing models and bid information, technical specifications and products sold to customers, account information and forecasts, company financial and operational results; and company strategic plans.

**ANSWER:**  Denied.


3.      Larson has opportunistically and unlawfully capitalized on that purloined information, engaging in a campaign to undermine MBX's relationships with its customers and steal them away by utilizing the confidential and trade secret information he learned as an MBX executive and egressed on his way out the door.  His unseemly conduct clearly violated the restrictive covenants he signed as part of his employment with MBX.

**ANSWER:**  Denied.


4.      As a result of Larson's misconduct, MBX needs permanent injunctive relief: (1) ordering Larson to provide to MBX for forensic analysis, any and all personal computers, thumb drives, external hard drives, back-up drives and other electronic data storage devices in Larson's possession, custody or control that contain MBX's confidential information; (2)  prohibiting Larson from using or disclosing MBX's confidential information in violation of his confidentiality obligations contained in his Employment Agreement with MBX; and (3) requiring Larson to provide an accounting of MBX's confidential information in his possession, custody or control, whether in hard copy, electronic or any other form.

**ANSWER:**  Denied.


5.      MBX is also entitled to monetary damages resulting from Larson's unlawful conduct that has already caused it to suffer substantial damage.

**ANSWER:**  Denied.

## PARTIES, JURISDICTION AND VENUE

6.     MBX is a Delaware limited liability company with its principal place of business located at 1200 Technology Way, Libertyville, Illinois 60048.

**ANSWER:**  Larson lacks sufficient knowledge to admit or deny the allegation.

7.     During his employment with MBX, Larson was a citizen of Illinois and, upon information and belief, currently resides in Wheaton, Illinois.

**ANSWER:** Admitted.

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because MBX has raised a federal question alleging that Larson has violated federal law. Specifically, MBX has alleged claims for trade secret misappropriation under the DTSA, 18 U.S.C. § 1367, *et seq*. and for violation of the CFAA, 18 U.S.C. § 1030, *et seq*.  This Court has supplemental jurisdiction over the MBX's other claims pursuant to 28 U.S.C. § 1367.

**ANSWER:**  Admitted.

9.     This Court has personal jurisdiction over Larson because he resides and has conducted business within the State of Illinois.

**ANSWER:**  Admitted.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**ANSWER:**  Admitted.

## FACTUAL ALLEGATIONS

### I.     MBX's Business

11.     MBX is an Illinois-based computer hardware company that specializes in designing and manufacturing OEM hardware solutions for application developers deploying their software on single-purpose systems.   MBX combines turnkey hardware programs with value-added

services, including platform configuration, hardware branding, inventory management, global logistics, product support, and system warranties. Founded in 1995, MBX's reputation is built on a strategic approach to customers' hardware programs.

**ANSWER:** Larson admits that MBX is an Illinois-based computer hardware company. Larson is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

## II.     MBX's Confidential and Trade Secret Information

12.     MBX has developed and maintains a large volume of trade secrets and other confidential and proprietary business information including, without limitation, information regarding identifiable, specific and discrete business opportunities being pursued by the company, customer lists, information regarding customers and potential customers including pricing models and bid information, technical specifications and products sold to customers, account information and forecasts, company financial and operational results, and company strategic plans.

**ANSWER:** Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. As it pertains to the relevant markets (Safety and Security), Larson is not aware of the existence of any MBX trade secrets.

## III.     MBX Protects its Trade Secrets and other Confidential Information

13.     MBX treats its trade secrets and other confidential information as confidential and makes reasonable efforts to maintain the secrecy and confidentiality of that information through, among other things: (a) requiring employees to enter into confidentiality agreements; (b) password protecting computers; (c) installing and maintaining specific software packages on its computers, including laptops used remotely by employees, so that the firm can track unauthorized copying, transfer or loss of sensitive company data; (d) requiring employees to return all information upon separation from MBX; and (e) limiting access to its trade secrets and other confidential information to only those employees and members who have a legitimate need for such information to perform their jobs on behalf of MBX.

**ANSWER:** Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

14.     MBX's trade secrets and other confidential information derive economic and competitive value from not being generally known to MBX's competitors and not being readily ascertainable by proper means by others who would gain economic value from its disclosure or use.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.  As it pertains to the relevant markets (Safety and Security), Larson is not aware of the existence of any MBX trade secrets.

15.     If MBX's trade secrets and other confidential information are used by a competitor, MBX's competitive position would be severely undermined, and its competitors would be able to trade on many years of MBX's valuable accumulated knowledge.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.  As it pertains to the relevant markets (Safety and Security), Larson is not aware of the existence of any MBX trade secrets.

## IV.     Larson's Employment With MBX

16.     On or about March 2, 2020, Larson became Director of Safety and Security for MBX.

**ANSWER:**  Larson admits that he was an employee of MBX for a brief period of time and assigned the title of Director of Safety and Security.

17.     In that position, Larson was responsible for developing a product portfolio specifically for the Safety and Security market.  This included negotiating costs and setting prices, as well as making recommendations on inventory positions for these products.  He was responsible for selling the value proposition of MBX to the Safety and Security market and maintaining strategic relationships with our customers in this market.

**ANSWER:**  Larson denies the allegations of this paragraph insofar as he was not responsible for developing a product portfolio for the Safety and Security market; Larson had

already developed a product line and product portfolio at the time of joining MBX, and at that time

MBX did not have any substantial portfolio or program in the Safety and Security space. Further,

Larson denies the allegations of this paragraph insofar as the value proposition Larson was

responsible for selling to the Safety and Security Market was his own and not MBX's except for

MBX's quality control program. Finally, Larson denies the allegations of this paragraph insofar

as it implies that MBX had preexisting strategic relationships with customers in relation to the

Safety and Security market; most of MBX's eventual Safety and Security market customers were

Larson's customers from before Larson joined MBX. Larson admits the remaining allegations of

this paragraph.


18.　　Larson was also responsible for setting the annual strategy for the Safety and
Security team and held overall responsibility for the team meeting financial and operational goals.
He was tasked with building relationships with vendors and partners. Larson was also responsible
for any training, hiring or firing decision on the team. He managed the overall budget for the team
and made decisions on where to invest in the team financially.

**ANSWER:** Larson denies the allegations of this paragraph insofar as it implies that Larson

had control over setting the annual strategy for the Safety and Security team. While Larson was

supposed to have been given control over setting the annual strategy, MBX refused him that

responsibility. Similarly, Larson denies he held overall responsibility for the team meeting

financial and operational goals as MBX exercised control over the team and thus had actual control

over the financial and operational goals. Larson also denies he was tasked with building new

relationships with vendors and partners; Larson's relationships with vendors and partners predated

his employment at MBX. Larson further denies the allegations of this paragraph insofar as he was

not responsible for training, hiring, or firing decisions on the team; he could only make

recommendations or request hirings or firings to MBX's executive team, Justin Fromella and Chris

Tucker. Regardless, despite requesting hiring to expand the team, that request was denied by MBX's executive team, and Larson was never able to hire another person to the team. Larson further denies the allegations of this paragraph insofar as management of the overall budget for the team implies control over that budget. Although Larson was given a budget, he was unable to leverage certain vendor and customer relationships due to lack of funding.

19.     In addition to his responsibilities relating to the Safety and Security market, Larson was also a member of the MBX leadership team and was involved in developing and executing the company's overall strategic plans.

**ANSWER:** Larson incorporates by reference his response to paragraph 18. Further, Larson denies the allegations of this paragraph insofar as the term "MBX leadership team" implies a leadership role. MBX's so-called "leadership team" included all of MBX's department heads, whose principal involvement was to demonstrate how they would execute the goals given to them by the executive team. Indeed, MBX refused Larson's request to be given equity in the company.

**V.     Larson's Access to MBX's Trade Secrets and other Confidential Information**

20.     To facilitate Larson's job responsibilities, MBX provided him with access to its trade secrets and other confidential business information, including but not limited to: its customer lists, information identifying specific and discrete business opportunities being pursued by MBX; information regarding customers and potential customers including pricing models and bid information; technical specifications and products sold to customers, account information and forecasts, company financial and operational results, and company strategic plans.

**ANSWER:** Larson denies that MBX provided Larson with access to trade secrets or confidential business information relevant to the Safety and Security market. Larson further denies the allegations of this paragraph insofar as it suggests that MBX provided Larson with any substantial customer lists, information identifying business opportunities, information regarding customers or potential customers, pricing models, bid information, technical specifications,

products sold to customers, account information or forecasts, or company financial and operational results or company strategic plans relevant to the Safety and Security market.

21. The development, maintenance, and confidentiality of this information are essential to MBX's business.

**ANSWER:** Larson lacks sufficient knowledge to admit or deny the allegation.

22. MBX maintained much of this information in certain electronic files located on MBX's secure computer servers.

**ANSWER:** Larson lacks sufficient knowledge to admit or deny the allegation.

23. Larson utilized this information throughout his employment at MBX and, without any legitimate justification, downloaded many of the files immediately prior to his departure from MBX.

**ANSWER:** Larson lacks sufficient knowledge to admit or deny the allegation because he does not know what "this information" or "the files" means. Larson denies the allegations of this paragraph insofar as it implies that he engaged in any wrongdoing or misappropriated any information.

**VI.** **Larson's Non-Solicitation, Confidentiality, and Work Made for Hire Obligations in the Employee Confidentiality and Inventions Assignment Agreement**

24.     In consideration of Larson's employment with MBX and in order to access to MBX's confidential information, Larson executed an Employee Confidentiality and Inventions Assignment Agreement ("Confidentiality Agreement"). (A copy of Larson's Confidentiality Agreement is attached as Exhibit A.)

**ANSWER:** Larson admits that he was presented with and required to sign an agreement after he accepted the offer of employment and resigned from his prior job. Larson denies any additional allegations.

25.     Section 9.2 of the Confidentiality Agreement states that it is governed by and must be construed in accordance with the laws of the State of Illinois. (Ex. A.)

**ANSWER:** Admitted.

26.     Section 1 of the Confidentiality Agreement contains a confidentiality provision that states:

>    1.1     **Proprietary Information.** The term "Proprietary Information" means any and all confidential and/or proprietary knowledge, data or information of the Company, whether embodied in tangible or intangible forms. By way of illustration but not limitation, "Proprietary Information" includes any information related to Inventions (as defined in Section 2 below), data, concepts, compilations, techniques, processes, methods, models, systems, designs, computer programs, object code, source code, source documentation, patent disclosures, procedures, trade secrets, formulas, development or experimental work, results of experimentation or t sting, specifications, strategies, plans for research or development, new products, marketing and selling, forecasts, business plans, budgets and unpublished financial statements, licenses, prices, costs, suppliers and customers, and any other nonpublic information that has commercial value.

>    1.2     **Restrictions on Disclosure and Use; Recognition of Company's Rights**. At all times during my employment and thereafter, I shall hold Proprietary Information in strictest confidence and not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) any Proprietary Information unless authorized by an officer of the Company in writing. I shall not use any Proprietary Information except in connection with my work for

the Company. I acknowledge that before publishing or otherwise disseminating outside of the Company (through public speaking engagements or otherwise) any material that incorporates any Proprietary Information, or otherwise relates to my work at the Company, I must 1rst obtain written approval from an officer of the Company. All Proprietary Information provided to or prepared by me is the sole property of the Company or its assigns.

1.3 **Third Party Information**. I acknowledge that the Company has received and in the future will receive confidential and/or proprietary information from third parties ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of the Third Party Information and to use it only for certain limit purposes. At all times during my employment and thereafter, I shall hold Third Party Information in strictest confidence and not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) any Third Party Information unless authorized by an officer of the Company in writing. I shall not use any Third Party Information except in connection with my work for the Company.

(Ex. A.)

**ANSWER:** Admitted.

27. Section 2 of the Employment Agreement contains an assignment of inventions provision that states:

2.1 **Intellectual Property Rights; Inventions.** The term "Intellectual Property Rights" means all trade secrets, patents, copyrights, trademarks, service marks, mask works and other intellectual property rights throughout the world, including without limitation all applications, extensions, renewals and continuations of any of the foregoing. The term "Inventions" means all discoveries, designs, developments, processes, methodologies, machines, compositions of matter, ideas, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), including any improvements to any of the foregoing.

2.2 **Assignment of Company Inventions.** I shall promptly make full written disclosure to the Company, shall hold in trust for the sole right and benefit of the Company, and hereby assign to the Company or its designee, all my right, title and interest throughout the world in and to any and all Inventions (and all Intellectual Property Rights with respect thereto) made or conceived or reduced to practice or learned by me, either alone or jointly

with others, during the period of my employment with the Company. Inventions assigned to the Company or its designee are hereinafter referred to as "Company Inventions." I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I acknowledge that all Company Inventions made by me (solely or jointly with others) within the scope of and during the period of my employment are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. To the extent any right, title or interest in and to Company Inventions cannot be assigned or licensed by me to the Company, I hereby irrevocably waive and agree never to assert such non- assignable and non-licensable rights, title and interest against the Company or any of the Company's successors in interest.

(*Id.*)

**ANSWER:** Admitted.


28.     Section 3 of the Employment Agreement contains a restrictive covenant provision that states:

3.     **No Conflicts or Solicitation.** I acknowledge that during my employment, I will have access to and knowledge of Proprietary Information and that such Proprietary Information includes valuable trade secrets of the Company. During the period of my employment with the Company, I shall not, unless authorized by an officer of the Company in writing, engage in any other employment or business activity directly related to the business in which the Company is now involved or becomes involved or in any other activities that conflict with my obligations to the Company. I represent that I am not currently and that I shall not become a party to any other agreement that is in conflict or will prevent me from complying with this Agreement. During the period of my employment with the Company and continuing until one year after my last day of employment with the Company, I shall not (a) directly or indirectly induce any employee of the Company to terminate or negatively alter his or her relationship with the Company, (b) solicit the business of any client or customer of the Com any (other than on behalf of the Company), (c) induce any supplier, vendor, consultant or independent contractor of the Company to terminate or negatively alter his, her or its relationship with the Company, or (d) (whether as an employee, employer, owner, operator, manager, advisor, consultant, contractor, agent, partner, director, stockholder, officer or any other similar capacity to an entity) engage in the same or similar business as the Company. Activities prohibited by the foregoing sentence shall

include any activity that may require or inevitably require disclosure of trade secrets or Proprietary Information of Company.

(*Id.*)

**ANSWER:** Admitted.


29. The Confidentiality Agreement is legal, valid, and binding. These covenants were supported by good and valuable consideration to which Larson otherwise would not have been entitled absent his execution of the agreement.

**ANSWER:** Denied.


30. MBX has fulfilled all of its obligations under the Agreement.

**ANSWER:** Denied.


**VII. Larson Misappropriates MBX's Trade Secrets and Other Confidential Information and Then Resigns**

31. MBX just recently learned through a third-party forensic examination that in September 2021, Larson began downloading a substantial volume of files from MBX's systems.

**ANSWER:** Larson is without knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, but denies he took any MBX confidential information.


32. Specifically, in the months prior to September 2021, Larson had downloaded approximately 10 files per month from MBX's systems; however, beginning on September 17, 2021, Larson downloaded over 930 files from MBX's system in a 10-day time frame.

**ANSWER:** Larson is without knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, but denies he took any MBX confidential information.

33.     The files Larson downloaded contained a trove of MBX's trade secret and confidential information, including: specific and discrete business opportunities being pursued by MBX; customer lists; information regarding customers and potential customers, including pricing models and bid information, technical specifications and products sold to customers, account information and forecasts, company financial and operational results; and company strategic plans.

**ANSWER:** Denied.


34.     More specifically, these files contained, among other things: account summaries; build forecasts; budget planning documents; talent acquisition plans; KPI trackers; overviews of MBX's portfolio; profiles of existing MBX customers; performance metrics; account strategies; MBX product lists; pricing information; and pricing profile information.

**ANSWER:** Denied.


35.     Upon information and belief, a significant portion of these files were not needed for Larson to carry out the responsibilities of his position with MBX at the time he downloaded them.

**ANSWER:** Larson is without knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, but believes that most, if not all of any files he

downloaded from MBX systems were his personal files and, if so, admits this allegation.

Otherwise, denied.


36.     Additionally, upon information and belief, around this same time frame, Larson began using his personal laptop for MBX business instead of his MBX-issued laptop, in violation of company policy.

**ANSWER:** Denied.

37.     Larson's mass download of information during this time frame was unauthorized and unknown to MBX.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph insofar as they concern MBX's knowledge.  Larson denies the remaining allegations in this paragraph.

38.     Shining a light on the alarming nature of Larson's mass download at the above-referenced times, Larson then resigned his employment from MBX on October 5, 2021. At the time of his resignation, Larson informed MBX that he was joining a company that did not directly compete with MBX; however, shortly after his resignation, MBX began receiving information that Larson had been approaching MBX customers to solicit their business. Shortly thereafter, Larson also began a consulting relationship with Velasea, LLC ("Velasea"), one of MBX's direct competitors.

**ANSWER:**  Larson admits that he began a consulting relationship with Velasea after he was terminated from MBX.  Larson denies the remaining allegations in this paragraph.

39.     Upon information and belief, Larson has utilized this information to benefit both himself and Velasea at MBX's expense.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph because he does not know what information "this information" refers to.  Larson denies the remaining allegations in this paragraph.

40.     There is absolutely no legitimate reason for Larson to continue to have access to this information given his resignation from MBX.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph because he does not know what information "this information" refers to.  Larson denies the remaining allegations in this paragraph.

**VIII.    Larson Breaches His Confidentiality Agreement With MBX**

41.    Velasea is an OEM system builder that sells products and services that compete with MBX's products and services.

**ANSWER:**  Admitted.


42.    Velasea is a "same or similar business" to MBX, as provided in the Confidentiality Agreement.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of any factual allegations in this paragraph and denies its legal conclusions.


43.    In November 2021, MBX learned that Larson was attempting to solicit MBX's customers for the benefit of himself and Velasea in violation of the Confidentiality Agreement.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph insofar as they concern MBX's knowledge.  Larson denies the remaining allegations in this paragraph.


44.    On November 16, 2021, MBX sent cease and desist letters to both Larson and Velasea, reminding them of Larson's obligations under the Confidentiality Agreement.

**ANSWER:**  Larson admits that MBX sent cease and desist letters to both Larson and Velasea.  Larson denies the legal conclusions in this paragraph and denies the remaining allegations in this paragraph.

45.     Following the cease and desist letters, MBX's counsel exchanged correspondence with counsel for Larson and Velasea.  In the correspondence, Larson and Velasea made representations that:  Larson shall comply with any required obligations of the MBX Agreement; neither party shall use or disclose "Proprietary Information" as defined in the MBX Agreement in connection with any services provided under Larson's agreement with Velasea; and Larson and Velasea shall voluntarily abide by the provisions of the MBX Agreement applicable to the solicitation of employees, clients, customers, suppliers, vendors, consultants, and independent contractors of MBX.

**ANSWER:**  Admitted.

46.     MBX accepted and relied on Larson and Velasea's representations.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

47.     However, in November 2022, MBX was informed by one of its customers that beginning in September 2021, and prior to the expiration of the restrictive covenant obligations in the Confidentiality Agreement, Larson and Velasea began soliciting their business and, as a result of those solicitations, MBX's customer was moving its business from MBX to Velasea.

**ANSWER:**  Larson denies soliciting MBX customers' business beginning in September 2021 or prior to the expiration of the restrictive covenant obligations in the Confidentiality Agreement.  Larson is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph.

48.     To date, a relatively substantial volume of business has been moved from MBX to Velasea as a result of Larson's conduct.

**ANSWER:**  Denied.

49.     Upon information and belief, Larson represented to this customer that he was going to take all of MBX's business.

**ANSWER:**  Denied.

## CAUSES OF ACTIONS

### COUNT I – BREACH OF CONTRACT

50.     MBX incorporates the allegations in Paragraphs 1 through 49 as though set forth fully herein.

**ANSWER:**  Larson incorporates by reference his responses to the preceding paragraphs 1-49 as though fully set forth herein.

51.     The Confidentiality Agreement between Larson and MBX is a valid and enforceable contract.

**ANSWER:**  Denied.

52.     The confidentiality and restrictive covenant provisions contained in the Confidentiality Agreement are reasonable in scope and duration and are reasonably necessary to protect MBX's legitimate and protectable interests in its client relationships and goodwill, as well as its trade secrets and other confidential and proprietary information.

**ANSWER:**  The allegations in this paragraph state legal conclusions to which no response is necessary.  Larson denies the remaining allegations in this paragraph.

53.     MBX performed its obligations under the Confidentiality Agreement.

**ANSWER:**  The allegations in this paragraph state legal conclusions to which no response is necessary.  Larson denies the remaining allegations of this paragraph.

54. Larson has breached his Confidentiality Agreement obligations by misappropriating MBX's trade secrets, copyrighted materials, and other confidential business information and data.

**ANSWER:** Denied.

55. Larson has breached his post-employment contractual obligations owing to MBX by: providing services to Velasea; soliciting, attempting to solicit, or in any other way, attempting to influence MBX's customers to alter or terminate their business relationship with MBX; and misusing MBX's confidential and proprietary information.

**ANSWER:** Denied.

56. As a result of Larson's breach of his Confidentiality Agreement, MBX has suffered and will continue to suffer irreparable and other injury. MBX is threatened with losing the value of its confidential information, its competitive advantage, income and goodwill in amounts which may be impossible to determine.

**ANSWER:** Denied.

## COUNT II – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE: MBX'S CUSTOMERS

57. MBX hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 56.

**ANSWER:** Larson incorporates by reference his responses to the preceding paragraphs 1-56 as though fully set forth herein.

58. Until the events giving rise to this action, MBX had maintained valid and lucrative business relationships with its customers and/or prospective customers.

**ANSWER:** Denied.

59.     MBX's relationships generated goodwill among these customers and created an expectation of future business.  The knowledge MBX has gained about these customers and the business terms of these relationships are confidential and proprietary business information.

**ANSWER:**  Denied.


60.     As a former MBX executive, Larson remains aware of MBX's customer relationships, the unique knowledge MBX possesses about these customers and the business terms of MBX's relationships with these customers.

**ANSWER:**  Denied.


61.     Larson has maliciously and tortiously misappropriated the information he acquired as an MBX executive to divert business from MBX to Velasea, intentionally and unjustifiably interfering with MBX's business relationships.

**ANSWER:**  Denied.


62.     As a result of Larson's tortious interference with MBX's business relationships with its customers and/or prospective customers, MBX has been injured and faces irreparable injury.  MBX has lost and is threatened with continuing to lose customers, its competitive advantage and goodwill.

**ANSWER:**  Larson admits that MBX has lost and continues to lose customers and goodwill due to its business practices and uncompetitive product and service offerings.  Larson denies the remaining allegations in this paragraph.

## COUNT III– VIOLATION OF THE ILLINOIS TRADE SECRETS ACT
## 765 ILCS § 1065, *et seq.*

63.     MBX incorporates the allegations in Paragraphs 1 through 62 as though set forth fully herein.

**ANSWER:** Larson incorporates by reference his responses to the preceding paragraphs 1-62 as though fully set forth herein.

64.     Larson has acquired MBX's trade secrets by improper means.

**ANSWER:** Denied.

65.     Larson has disclosed and/or used MBX's trade secrets without MBX's consent.

**ANSWER:** Denied.

66.     As a direct and proximate result of Larson's conduct in violation of the ITSA, MBX has suffered damages in an amount to be determined at trial and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its information, its goodwill and other legitimate business interests.

**ANSWER:** Denied.

## COUNT IV–VIOLATION OF THE DEFEND TRADE SECRETS ACT
## 18 U.S.C. § 1836, *et seq.*

67.     MBX incorporates the allegations in Paragraphs 1 through 66 as though set forth fully herein.

**ANSWER:** Larson incorporates by reference his responses to the preceding paragraphs 1-66 as though fully set forth herein.

68.     MBX's clients are located throughout the United States and the world.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

69.     MBX's information that Larson misappropriated and downloaded prior to his resignation is intended MBX's [sic] use in providing products and services to its customers throughout the United States and the world.

**ANSWER:**  Denied.

70.     The information that Larson misappropriated is the property of MBX and qualifies as a trade secret under the DTSA, 18 U.S.C. § 1836, *et seq*.

**ANSWER:**  Denied.

71.     While Larson was employed by MBX, he knew or should have known that the information was protected and that he had a duty to maintain the secrecy of that information.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, because he does not know what "the information" means.  Larson denies the remaining allegations in this paragraph.

72.     Upon information and belief, Larson has willfully and improperly used and is using MBX's trade secrets and has disclosed and used and intends to continue to disclose and use MBX's trade secrets for his own financial benefit.

**ANSWER:**  Denied.

73.     Larson has no justification for this disclosure and use, and knows or should know that the trade secrets belong to MBX.

**ANSWER:**  Denied.


74.     Larson's use and disclosure of MBX's trade secrets will irreparably harm MBX and destroy the confidential nature of the information.

**ANSWER:**  Denied.


75.     MBX has suffered damages as a result of Larson's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its information, its goodwill and other legitimate business interests.

**ANSWER:**  Denied.


## COUNT V– VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
## 18 U.S.C. §1030, *et seq.*

76.     MBX incorporates the allegations in Paragraphs 1 through 75 as though set forth fully herein.

**ANSWER:**  Larson incorporates by reference his responses to the preceding paragraphs 1-75 as though fully set forth herein.


77.     MBX's computer system is a protected network which is used across state lines in interstate commerce, has Internet access across state lines, and is used to transfer MBX's information for sale in interstate commerce.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

78.     Larson was not authorized by MBX to access its computer system for personal gain, access its computerized information, copy electronic information files, destroy electronic information files, send electronic files to USB memory devices or other external electronic storage devices or continue to possess MBX's electronic files and data for personal gain or that of a competitor.

**ANSWER:** Larson denies that he was not authorized by MBX to access its computerized information, copy electronic information files, destroy electronic information files, send electronic files to USB memory devices or other external electronic storage devices. Larson admits that he was not authorized by MBX to continue to possess MBX's electronic files and data for personal gain or that of a competitor.

79.     As a result of Larson's actions, MBX has suffered damage based on the impairment to the integrity of its computer systems, as well as cost associated with determining the extent of Larson's misconduct.

**ANSWER:** Denied.

80.     MBX has already expended over $5,000 to respond to Larson's offenses, including the cost of an independent forensic investigation.

**ANSWER:** Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

81.     Based on the foregoing, Larson:

(a)     intentionally accessed a computer system without authorization or exceeded his authority to obtain information from a protected computer causing damage in excess of $5,000 during a one year period in violation of 18 U.S.C. §1030(a)(2)(C);

(b)     knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded his authorized access, and by means of such conduct furthered the intended fraud and obtained valuable

information resulting in damages exceeding $5,000 during a one year period in violation of 18 U.S.C. §1030(a)(4);

(c)     knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer in excess of $5,000 during a one-year period in violation of 18 U.S.C. §1030(a)(5)(A);

(d)     intentionally accessed a protected computer without authorization or exceeded his authorized access, and, as a result of such conduct, recklessly cause damage in excess of $5,000 during a one-year period in violation of 18 U.S.C. §1030(a)(5)(B); and/or

(e)     intentionally accessed a protected computer without authorization or exceeded his authorized access, and, as a result of such conduct, caused damage and loss in excess of $5,000 during a one-year period in violation of 18 U.S.C. §1030(a)(5)(C).

**ANSWER:** Denied.


82.     MBX has suffered damages as a result of Larson's actions in an amount to be determined at trial and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its information, its goodwill and other legitimate business interests.

**ANSWER:** Denied.


## COUNT VI - BREACH OF FIDUCIARY DUTY

83.     MBX incorporates the allegations in Paragraphs 1 through 82 as though set forth fully herein.

**ANSWER:** Larson incorporates by reference his responses to the preceding paragraphs 1-82 as though fully set forth herein.


84.     As a MBX executive, Larson owed MBX an undivided duty of loyalty and was obligated to act with the utmost good faith and candor and in the best interests of MBX.

**ANSWER:** Denied.

85.     MBX relied on Larson's duties of loyalty, integrity, and faithful performance of his duties and responsibilities.

**ANSWER:**  Larson is without knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

86.     Larson knowingly and willingly breached those fiduciary duties by misappropriating MBX's trade secrets for his own personal gain through improper means.

**ANSWER:**  Denied.

87.     As a direct and proximate result of Larson's disloyalty and breach of his fiduciary duties, MBX has been and is being harmed.  Larson is still in possession of MBX's valuable confidential business information and trade secrets and is able to access and use this information for his own personal gain and for the benefit of MBX's competitors.

**ANSWER:**  Denied.

88.     On information and belief, Larson has shared this confidential information with at least one of MBX's competitors, using the information to MBX's detriment.

**ANSWER:**  Denied.

89.     Larson's actions have caused and will continue to cause damage to MBX and, unless restrained, will further damage MBX, the nature and extent of which may not be able to be proven with certainty, irreparably injuring MBX, leaving it without an adequate remedy at law.

**ANSWER:**  Denied.

## GENERAL DENIAL

Unless expressly stated otherwise herein, Larson denies every allegation contained in Paragraphs 1-89 of Plaintiff's Complaint (Dkt. 1) and denies that Plaintiff is entitled to any of the relief requested in its Prayer for Relief.

## AFFIRMATIVE DEFENSES

Pursuant to Rule 8(c) of the Federal Rules of Civil Procedure, Larson asserts the following affirmative defenses to Plaintiff's allegations in the Complaint. By alleging the affirmative defenses below, Larson does not admit that he has the burden of proof on such matters or that any of the following defenses are not already at issue by virtue of the foregoing responses.

### FIRST DEFENSE
### (Accord and Satisfaction)

Plaintiff engaged in conduct and actions to constitute an accord and satisfaction concerning the obligations, conduct, or acts at issue in the Complaint, barring recovery from Larson.

### SECOND DEFENSE
### (Estoppel)

Plaintiff's claims may be barred, in whole or in part, by the equitable doctrine of estoppel. Specifically, as early as November 2021, Plaintiffs were aware that Larson was working at Velasea yet did not initiate this lawsuit until January 2023, over a year after their initial knowledge of Larson's new employment. Further, on January 26, 2022, Plaintiffs sent a letter to Larson implicitly acknowledging that his activities at Velasea did not breach the Confidentiality Agreement, and then filed this lawsuit a full year later.

## THIRD DEFENSE
## (Unenforceability of Confidentiality Agreement and Restrictive Covenants)

Plaintiff's claims are barred, in whole or in part, because the Confidentiality Agreement and its restrictive covenants are unenforceable as contrary to law and public policy.

## FOURTH DEFENSE
## (Failure of Consideration)

In the alternative, Plaintiff's claims are barred, in whole or in part, by failure of consideration. Larson was neither employed by MBX for a period of two years, nor provided consideration adequate to support an agreement to not compete or to not solicit.

## FIFTH DEFENSE
## (Laches)

Plaintiff's claims may be barred, in whole or in part, by the equitable doctrine of laches. Larson has been working at Velasea since the fall of 2021, and Plaintiff learned of Larson's employment there by no later than November of 2021. Further, between November of 2021 and January of 2022, Plaintiff and Larson, via counsel, exchanged no fewer than eight letters concerning Plaintiff's unfounded allegations that Larson was in breach of confidentiality obligations. Yet Plaintiff did not initiate this present lawsuit until January 2023, even though Plaintiff had in its possession Larson's laptop computer that was returned to Plaintiff immediately following Larson's termination in early October, 2021. Plaintiff's delay in filing this lawsuit is unreasonable and, to the extent data on Plaintiff's server and computer devices relevant to

Plaintiff's allegations was lost in the intervening time, then that would unduly hinder Larson's ability to rebut those allegations.

## SIXTH DEFENSE
### (Release)

Plaintiff's claims are barred, in whole or in part, based on release as, to the extent the Confidentiality Agreement and its restrictive covenants created obligations that would have prevented Larson from working at Velasea or from undertaking activities at Velasea that were known to MBX by January 26, 2022, MBX released Larson of those obligations via its letter dated January 26, 2022.

## SEVENTH DEFENSE
### (No Misappropriation of Trade Secrets)

Plaintiff's claims are barred, in whole or in part, because no misappropriation of trade secrets occurred. Larson is not aware of the existence of any MBX trade secret information relevant to the Safety and Security market. Further, Larson neither took, nor had in his possession any MBX confidential or trade secret information following his termination from MBX. Further, Larson's activities at Velasea constituted independent development.

## EIGHTH DEFENSE
### (Unclean Hands)

Plaintiff's claims are barred, in whole or in part, based on unclean hands as Plaintiff engaged in inequitable behavior involving fraud, deceit, unconscionability or bad faith related to Larson's employment.

## NINTH DEFENSE
### (No Injury or Harm)

There have been no injuries suffered by Plaintiff by reason of any act alleged against Larson.

## RESERVATION OF RIGHTS

Larson reserves the right to add any additional defense or counterclaim that may be revealed during course of discovery.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Thomas Larson seeks judgment in his favor and an Order granting the following relief:

A.     Judgment against Plaintiff and in favor of Larson as to all claims for relief in the Complaint;

B.     An Order awarding Larson fees and costs; and

C.     Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Thomas Larson hereby demands a trial by jury of all issues so triable.

Dated: April 4, 2023

Respectfully submitted,

By: */s/ Barry F. Irwin*
Barry F. Irwin, P.C.
Iftekhar A. Zaim
Ariel Katz
**IRWIN IP LLP**
150 N. Wacker Dr., Suite 700
Chicago, IL 60606
Tel: (312) 667-6080
birwin@iwinip.com
izaim@irwinip.com
akatz@irwinip.com

*Counsel for Defendant Thomas Larson*